UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

ROBERT MELCHER,                    )
          Plaintiff,               )
                                   )
                                   )
          v.                       )          Civil No. 3:20-cv-30094-KAR
                                   )
                                   )
LOWE'S HOME CENTER, LLC,           )
          Defendant.               )


MEMORANDUM AND ORDER ON DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT AND PLAINTIFF'S
MOTION TO STRIKE RADER AFFIDVIT AND DEPOSITION TESTIMONY
(Dkt Nos. 45, 50)


ROBERTSON, U.S.M.J.

Robert Melcher ("Plaintiff") brings this action against his former employer Lowe's Home Center, LLC ("Defendant" or "Lowe's") asserting claims for age and disability discrimination in violation of the Massachusetts anti-discrimination statute, Mass. Gen. Laws ch. 151B.  Presently before the court are Defendant's motion for summary judgment (Dkt. No. 45) and Plaintiff's motion to strike certain material from the summary judgment record (Dkt. No. 50).  The parties have consented to this court's jurisdiction.  *See* 28 U.S.C. § 636(c); Fed. R. Civ. P. 73 (Dkt. No. 16).  For the following reasons, Plaintiff's motion to strike is DENIED and Defendant's motion for summary judgment is DENIED as to Plaintiff's claim of age discrimination but GRANTED as to Plaintiff's claim of disability discrimination.

## I.      MOTION TO STRIKE

Plaintiff seeks to strike from the summary judgment record an affidavit and the deposition testimony of his former manager, Mark Rader.  First, Plaintiff argues that the affidavit should be stricken under the so-called sham affidavit doctrine, which provides that "[w]hen an interested witness has given clear answers to unambiguous questions, he cannot create a conflict and resist summary judgment with an affidavit that is clearly contradictory, but does not give a satisfactory explanation of why the testimony is changed."  *Colantuoni v. Alfred Calcagni & Sons, Inc.*, 44 F.3d 1, 4-5 (1st Cir. 1994).  Here, "[t]he cited disparity between the declaration and deposition testimony is not such that the Court must regard it as 'clearly contradictory.'"  *Mantha v. QuoteWizard.com, LLC*, Civil No. 19-12235-LTS, 2022 WL 325722, at *2 n.4 (D. Mass. Feb. 3, 2022).  Thus, Mr. Rader's affidavit will not be stricken on this basis.

Second, Plaintiff argues that Rader's deposition testimony should be stricken because it "is riddled with such untruths and inconsistencies that the Court, exercising its duty as gatekeeper, must strike or disregard [it]" (Dkt. No. 50 at 1).  In the testimony that Plaintiff seeks to strike, Rader denies any recollection of the two employees hired to replace Plaintiff.  Plaintiff suggests that this lack of recall is incredible based on electronic correspondence regarding the two individuals that included Rader.  The fact that Rader was included on electronic correspondence regarding the two individuals and even worked with them for a short time does not establish that he was lying when he claimed not to recall them.  Plaintiff may find the testimony incredible, and he is free to question Mr. Rader about his claimed lack of memory to convince a factfinder that he is being untruthful.  However, there is no basis for excluding the testimony simply because Plaintiff does not believe it.  Indeed, "credibility determinations are for the factfinder at trial, not for the court at summary judgment."  *Simas v. First Citizens' Fed.*

*Credit Union*, 170 F.3d 37, 49 (1st Cir. 1999) (citing *Perez–Trujillo v. Volvo Car Corp. (Sweden)*, 137 F.3d 50, 53 (1st Cir.1998)).  Accordingly, Plaintiff's motion to strike is without merit and will be denied.

## II.    MOTION FOR SUMMARY JUDGMENT

### A.  Standard of Review

Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A dispute is 'genuine' if the evidence 'is such that a reasonable jury could resolve the point in the favor of the non-moving party …,' *Ellis v. Fid. Mgmt. Tr. Co.*, 883 F.3d 1, 7 (1st Cir. 2018) (citation omitted), and a fact is 'material' if it 'has the potential of affecting the outcome of the case,' *Pérez-Cordero v. Wal-Mart P.R., Inc.*, 656 F.3d 19, 25 (1st Cir. 2011) (citation omitted)."  *Taite v. Bridgewater State Univ., Bd. of Trs.*, 999 F.3d 86, 93 (1st Cir. 2021).  In evaluating whether a genuine dispute of material fact exists, a court "'look[s] to all of the record materials on file, including the pleadings, depositions, and affidavits' without evaluating 'the credibility of witnesses [ ] or weigh[ing] the evidence.'"  *Id.* (second and third alteration in original) (quoting *Ahmed v. Johnson*, 752 F.3d 490, 495 (1st Cir. 2014)).

A party seeking summary judgment is responsible for identifying those portions of the record "which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The movant can meet this burden either by "offering evidence to disprove an element of the plaintiff's case or by demonstrating an 'absence of evidence to support the non-moving party's case.'"  *Rakes v. United States*, 352 F. Supp. 2d 47, 52 (D. Mass. 2005) (quoting *Celotex*, 477 U.S. at 325).  If the moving party meets its burden, "[t]he non-moving party bears the burden of placing at least one material fact into dispute."

*Mendes v. Medtronic, Inc.*, 18 F.3d 13, 15 (1st Cir. 1994) (citing *Celotex*, 477 U.S. at 325).  The record is viewed in favor of the nonmoving party, and reasonable inferences are drawn in the nonmoving party's favor.  *See Garcia-Garcia v. Costco Wholesale Corp.*, 878 F.3d 411, 417 (1st Cir. 2017) (citing *Ameen v. Amphenol Printed Circuits, Inc.*, 777 F.3d 63, 68 (1st Cir. 2015)).

 B. Factual Background[1]

In 2014, Plaintiff began working as an Assistant Store Manager ("ASM") in Defendant's retail store located in Ware, Massachusetts (Def. SOF ¶¶ 1-2; Pl. Resp. ¶¶ 1-2).  During his tenure in Ware, Plaintiff qualified for the management's bonus plan and received a ring and a diamond for sales performance (Pl. SDF ¶ 2).  Plaintiff was never formally disciplined while he was in Ware; he was "talked to" on only one occasion in 2016 or 2017 for failing to secure all the gates and doors at the Ware store (Pl. SDF ¶ 3).

On September 2, 2017, Plaintiff was transferred to Defendant's retail store located in Springfield, Massachusetts, where he became ASM of Operations (Def. SOF ¶¶ 2, 7; Pl. Resp. ¶¶ 2, 7).  Lowe's has about 1,700 stores in the chain, and Springfield was regarded as one of the toughest stores to run in the entire company (Pl. SDF ¶ 27).  Before Plaintiff moved to the Springfield store, District Manager Kevin Becker asked Plaintiff on several occasions to accept a transfer to the Springfield store because there was a culture problem, and he wanted Plaintiff to help improve the store's performance (Pl. SDF ¶ 28).

Not quite a year after Plaintiff came to Springfield, on August 18, 2018, Mark Rader ("Rader") was transferred to the Springfield store as Store Manager, in which role he was Plaintiff's direct supervisor (Def. SOF ¶¶ 3, 6; Pl. Resp. ¶¶ 3, 6).  Plaintiff was 62 years-old at

---

[1] The facts are taken from the consolidated statement of facts (Dkt. No. 53), which includes Defendant's statement of facts ("Def. SOF") and Plaintiff's responses thereto ("Pl. Resp."); Plaintiff's statement of material facts in dispute (Dkt. No. 56-1), which includes Plaintiff's statement of disputed facts ("Pl. SDF"); and from the materials cited therein.

that time, significantly older than Rader, who was in his mid-40s (Pl. SDF ¶ 4).  Plaintiff was

also older than the other three ASMs in Springfield, who were in their early-to-mid 40s (Pl. SDF

¶ 4).  During Plaintiff's time working under Rader, Rader referred to him as "old man," "jumpy

old man," "grumpy old man," and "grandpa;" he also referred to another employee as an "old

guy," and said that another employee was "getting too old for this" (Def. SOF ¶¶ 126, 130; Pl.

Resp. ¶¶ 126, 130; Pl. SDF ¶ 40).  In addition, Rader stated that Plaintiff was "probably there

when Jesus was born;" that Plaintiff "should have to work during the day because [he doesn't]

have headlights on [his] car because [he's] not allowed to drive at night;" and that Plaintiff

needed a position that allowed him to sit as Rader needed "young blood on the [sales] floor"

(Def. SOF ¶¶ 127-128; Pl. Resp. ¶¶ 127-128; Pl. SDF ¶ 41).  Further, on one occasion in

November 2018, Rader mentioned employees' salaries and asked Plaintiff is he was going to

retire soon (Def. SOF ¶ 129; Pl. Resp. ¶ 129; Pl. SDF ¶ 22).

According to Defendant's job description:

> The Assistant Store Manager is responsible for leading a team of
> associates who work together to ensure the store remains in-stock
> and customers receive exceptional service while shopping in a
> clean and safe store environment.  The Assistant Store Manager is
> accountable for achieving sales and margin goals while driving
> operational efficiencies and maximizing overall customer
> satisfaction with Lowe's in-store experience.  In addition, the
> Assistant Store Manager is expected at times to provide full
> leadership over the store.

(Dkt. No. 46-1 at 79).  The document further provides that specific ASM responsibilities include

team leadership, program execution, business leadership, manager on duty, and self-leadership

(Dkt. No. 46-1 at 79-80).  The ASM of Operations is assigned additional responsibilities,

including overseeing all front-end and back-end operational programs, driving collaboration

between day and night operations teams, and identifying any barriers to operations processes or

the customer experience (Dkt. No. 46-1 at 81).  According to Plaintiff, in addition to his assigned

duties, he was held accountable for "IRP" functions (i.e., Inventory Replacement Process), which

were properly the obligation of other ASMs but that Rader assigned to Plaintiff (Pl. Resp. 8; Pl.

SDF ¶ 16).  As ASM in the Springfield store, Plaintiff was in charge of and responsible for,

directly or indirectly, all employees under the department heads, which numbered approximately

50 to 55 individuals (Def. SOF ¶ 10; Pl. Resp. ¶ 10).

In or around late October 2018, Plaintiff failed to ensure that a bag of money generated

from store sales was secured at store closing; an employee left the bag out and Plaintiff, as ASM,

was ultimately responsible for making sure it was secured (Def. SOF ¶ 14).[2]  According to

Defendant, on November 9, 2018, Rader issued Plaintiff an initial warning through an Employee

Corrective Action Report related to this incident (Dkt. No. 46-1 at 139).  The document states

that Plaintiff "demonstrated poor job performance and leadership in his role, which failed to

meet Lowe's standards and resulted in inconsistent execution of Lowe's programs when he

failed to secure the cash bags" (Dkt. No. 46-1 at 143).  The document further provides that

Plaintiff "is expected to demonstrate immediate and sustained improvement in his role and

complete all duties as assigned per company guidelines.  Any future violations of Lowe's policy

and procedure or performance deficiency could result in further disciplinary action up to and

including termination" (Dkt. No. 46-1 at 143).  The document bears a handwritten notation on

the "Employee's Signature" line, stating: "*Did not sign … Said 'I know it does not matter

anyway,'" followed by the initials "MR" (Dkt. No. 46-1 at 143).  Rader signed the document and

dated it November 9, 2018 (Dkt. No. 46-1 at 143).  According to Plaintiff, Rader never had a

---

[2] Plaintiff purports to dispute this SOF citing to certain pages of his deposition testimony but that
testimony acknowledges that the head cashier left a cash bag out in the garden department
overnight and that, since he was overseeing the store that night, it became his responsibility (Dkt.
No. 51-1 at 22-23).

conversation with him about this incident, he never saw the Employee Corrective Action Report until after his employment was terminated, and he never refused to sign the document or said, "I know it does not matter anyway" (Dkt. No. 51-1 at 21-22, 26; Pl. SDF 21).  Rader, for his part, has no recollection of sitting down with Plaintiff to give him the form or of Plaintiff refusing to sign it (Dkt. No. 51-1 at 82).

In late January or early February 2019, Plaintiff asked Rader if, when he was getting winded, he could take time to sit down for a few minutes.  His intent was to make Rader aware of the possibility that he might need to take breaks and make sure Rader was okay with that (Def. SOF ¶¶ 88-89; Pl. Resp. ¶¶ 88-89).  Plaintiff needed to "sit for a short time" and needed "additional time to 'catch [his] breath'" and to "occasionally rest" (Def. SOF ¶ 90; Pl. Resp. ¶ 90).  Rader did not respond to Plaintiff's question (Def. SOF ¶ 91; Pl. Resp. ¶ 91).  On an occasion shortly thereafter when Plaintiff and Rader were working together, Rader told Plaintiff that he could sit down and take a break if needed (Def. SOF ¶ 93; Pl. Resp. ¶ 93).  The accommodation Plaintiff wanted at this time was to be allowed to take two-to-three-minute breaks two to three times per day (Def. SOF ¶ 94; Pl. Resp. ¶ 94).[3]  Plaintiff testified that sometimes he would take these breaks, but other times, he was not able to do so (Dkt. No. 46-1 at 26).

Plaintiff completed the self-evaluation portion of a Fiscal Year 2018 Evaluation Form (covering the period from February 1, 2018, to January 31, 2019), on December 14, 2018, and routed it to Rader (Def. SOF ¶ 20; Pl. Resp. ¶ 20).  The parties dispute when Rader completed the manager evaluation portion of the form.  Rader attests that he entered his comments into the evaluation form and submitted it to District Manager Kevin Becker for review on January 30,

---

[3] Plaintiff purports to dispute this SOF but acknowledges that this was the initial accommodation he sought.

2019, and, indeed, Becker electronically signed it on that date (Dkt. No. 46-1 at 139; Def. SOF ¶ 22; Pl. Resp. ¶ 22).  However, the document reflects that neither Rader nor Plaintiff electronically signed it until April 15, 2019, a date on which Plaintiff was out sick (Dkt No. 46-1 at 158-159; Pl. SDF ¶ 26).  Nevertheless, Rader denies making any changes to the document after January 30, 2019, denies signing it on April 15, 2019, denies signing it on behalf of Plaintiff at any time, and has no recollection of meeting with Plaintiff to review the 2018 Performance Evaluation (Dkt. No. 46-1 at 139; Pl. SDF ¶ 12).

Within the document itself, Rader rated Plaintiff as displaying an "Inconsistent Performance" (Dkt. No. 46-1 at 158).  Plaintiff had been rated by his managers as displaying a "Solid Performance," in his three previous evaluations (Dkt. No. 56-1 at 168-189).  In the evaluation, completed by Rader, Rader concluded that Plaintiff "lacked the Lowe's operational knowledge needed" (Dkt. No. 46-1 at 158).  Specifically, he said, Plaintiff did not have the knowledge to be able to support his department managers on the front or back end of the building (Dkt. No. 46-1 at 158).  Rader noted that Plaintiff needed to show self-initiative to learn the tasks under him and be able to help and lead the employees he supervised, rather than leaning on them to perform tasks in which he lacked knowledge (Dkt. No. 46-1 at 158).  Plaintiff, in contrast, gave himself a rating of "Solid Performance," and had the following to say:

> This fiscal year was a year of change and growth for me.  I started
> the year in the role I had been in since coming to Lowe's a little
> over 4 years ago, that being ASM Service.  At Mid year I was
> moved to the ASM Support role and that has proven to be both a
> challenge and I feel a success.  I took over a front end that was in
> disarray and a back end receiving team that had both morale and
> tenure problems.  The front end challenges were leading to a very
> high number of CCICs.  Couple that with the fact that almost every
> delivery was resulting in the same customer concerns and we had
> our hands full.  Over the last few months we have been able to
> improve significantly our service desk and totally restructured the
> delivery and receiving areas.  The results shown speak for

8

> themselves.  We have had virtually no delivery issues for over 3
> months now.  Also, the front end customer cases have dropped to a
> tenth of what they were.  We've done this through better utilization
> of personnel and consistent monitoring and holding our front end
> associates to a higher expected level of service.

(Dkt. 46-1 at 158).  Becker, for his part, wrote, "Bob – Thank you for everything you do.  Please

continue to model the behaviors of the big three focuses of 2019" (Pl. SDF ¶ 10).

On April 1, 2019, Rader, in consultation with District Human Resources Business Partner

Ashlee Whitcomb ("Whitcomb"), issued Plaintiff a Performance Improvement Plan ("PIP")

(Def. SOF ¶¶ 24-25; Pl. Resp. ¶¶ 24-25; Dkt. 46-1 at 161-164).  The PIP identified "Performance

Expectations," including "Execution of the ASM – Operations Position," "Positive and

Supportive Demeanor," and "People Leadership" (Dkt. No. 46-1 at 162).  For each performance

expectation, the PIP outlined "Measures of Success/Required Outcomes," and "Available

Support" (Dkt. No. 46-1 at 162).  The document stated that "failure to meet these performance

expectations may result in consequences, up to and including termination of employment" (Dkt.

No. 46-1 at 161).  Rader told Plaintiff that he wanted him to read over the PIP, which Plaintiff

signed on April 1, 2019, and have a plan to meet the expectations at the next meeting (Dkt. No.

46-1 at 162; Dkt. No. 56-1 at 45; Def. SOF ¶ 30; Pl. Resp. ¶ 30).

Rader followed up with an email asking Plaintiff to prepare his action plans for the three

expectations in the PIP which they had reviewed (Def. SOF ¶ 31; Pl. Resp. ¶ 31).  Rader also

asked Plaintiff to let him know what support he might need and to confirm that he understood

everything they had discussed (Def. SOF ¶ 31; Pl. Resp. ¶ 31).  Plaintiff responded to Rader's

email, stating: "Thank you for the talk today.  I know that there is a lot I still have to learn in this

job and I also know what your expectations are for an Operations ASM.  I look forward to our

weekly meetings and tracking the progress made" (Def. SOF ¶ 32; Pl. Resp. ¶ 32).  Plaintiff did

not ask for any support or assistance in the email (Def. SOF ¶ 33; Pl. Resp. ¶ 33).

On April 9, 2019, Plaintiff and Rader met to discuss the PIP (Def. SOF ¶ 34; Pl. Resp. ¶

34).  At this meeting, an "Action Plan" was added to the PIP (Dkt. No. 46-1 at 163).  Plaintiff

maintains that he was being held responsible for "The Wire," "RTM," and "IRP," which were

properly responsibilities of the service manager, not the operations manager (Dkt. No. 56-1 at

45-46).  Following the meeting, Rader sent an email to Whitcomb, copying Becker, notifying

them that he had met with Plaintiff to enter his employee action plans into the PIP (Dkt. No. 46-1

at 168).  He then stated:

> Also discussed performance of the past week and the issues held
> after our initial PIP conversation on 4/1/19.  IRP was not improved
> last week with multiple departments.  Poor conditions of receiving
> and the back of the store.  Poor execution of red vest ready
> program with new seasonal associates.  Associates [sic] schedules
> not being completed.

(Dkt. No. 46-1 at 168).

Rader sent another email to Whitcomb, copying Becker, on April 15, 2019, regarding

Plaintiff's performance (Dkt.  No. 46-1 at 170-173).  Rader began the email by stating that, "if

anything [Bob] has done worse things since going on [the PIP]" (Dkt. No. 46-1 at 170).  Rader

followed up this introduction with a bulleted list of issues as follows:

- Thursday night he closed with Rick (New DS).  3 exterior
  doors were left unlocked (the front exit vestibule leading to
  outside was actually still powered and opened by motion)
  …

- Last night he had trouble with an alarm point.  He did call it in
  but the door with the issues was an exterior emergency door
  and the door was found wide open by Jordan last night (as he
  was working overnights for the tool reset).

- Phone call from Crystal received from Bob on Friday morning pretty much telling her that she has to "have his back" on things as he isn't completing his daily duties …

- 3 delivery loading tickets that were signed off on by Bob since this past Wednesday were incorrect items sent out to 3 different customers

- He told Steve (Overnight DS) last night he wasn't feeling well because he was having troubles breathing so he was going to the hospital after he locked up the store and would not be in for his shift today. He is scheduled for 8am today and I have yet to hear from him.

(Dkt. No. 46-1 at 170).  Rader ended his email by asking, "Do we have to wait out this PIP or

can we move faster just based off the above was from just the 1st week" (Dkt. No. 46-1 at 170).

Four days after Rader's second email, on April 19, 2019, Rader and Plaintiff met to

discuss Plaintiff's performance (Def. SOF ¶ 38; Pl. Resp. ¶ 38).  Both Rader and Plaintiff entered

comments into the PIP and signed to indicate that a follow-up discussion had occurred (Dkt. No.

46-1 at 164).  In the document, Rader indicated that Plaintiff did not meet expectations and

offered explanations for each performance expectation (Dkt. No. 46-1 at 164).  Regarding

"Execution of the ASM-Operations Position," Rader stated:

> IRP-Dup Scan LW over 5%, Seasonal associates with no hours added for posted weeks, Freight Flow – Continued unload issues nightly (pictures) causing stocking delays for stocking crew – Night Stocking Team short help with no plan to adjust per needs – Bullpen unorganized – Receiving back aisle unorganized.  SOS Resale list not up to date with no direction.  FSA duties lacking execution and cleanliness – hazmat-daily assignment.
>
> RTM – Productivity is improving daily

(Dkt. No. 46-1 at 164).  As for "Positive and Supportive Demeanor," Rader noted:

> No signs of unsupported or negative demeanor from last conversation.  Need to continue to work on supporting associates through daily interaction and self guidance while being fair and consistent throughout

11

(Dkt. No. 46-1 at 164).  Finally, relative to "People Leadership," Rader provided:

> No written or e-mailed work-task lists for DS's from continued
> communication from SM.  Daily communication with associates
> continues to lack and is key to gaining respect of peers, direct
> reports, and rest of the store.

(Dkt. No. 46-1 at 164).

Rader sent an email to Whitcomb and Becker that same day, stating that he had spoken

with Plaintiff that morning about how he was doing with his health concerns (Dkt. No. 46-1 at

175; Pl. SDF ¶ 46).  According to Rader, Plaintiff "found out he is having some lung issues that

is [sic] going to cause permanent damage but that it does not seem to have anything to do with

his heart" (Dkt. No. 46-1 at 175; Pl. SDF ¶ 46).  Rader further reported that Plaintiff "said he

knows he is not able to do this job and it is causing him extra stress and working the 50 plus

hours a week for years has taken it's [sic] toll on him," and "asked if it was possible to step down

out of the ASM position into a DS position (Dkt. No. 46-1 at 175; Pl. SDF ¶¶ 37, 46).  Rader,

however, told Plaintiff that the PIP "is considered a final opportunity for him to get on track of

the ASM position and demoting out of the roll [sic] while on the PIP is not an option" (Dkt. No.

46-1 at 175; Pl. SDF ¶¶ 38, 47).  Plaintiff denies stating that he knew he was unable to do the job

and maintains instead that he asked to step down because his health issues were negatively

affecting his ability to do the job (Pl. Resp. ¶ 40).

Plaintiff states that neither Rader nor Becker have been able to identify a Lowe's policy

that prohibited his requested transfer (Pl. SOF ¶¶ 41-42; Pl. SDF ¶ 50).  Plaintiff also represents

that Whitcomb was not able to identify a policy, but he fails to cite to any record evidence to

support the claim.  Defendant, on the other hand, has submitted an excerpt of Whitcomb's

deposition where she testified that Defendant had a policy that provides that "[a]nybody who's

on a PIP is considered – basically like a final notice, and anybody that's on a final notice, job moves, demotions, changes, they don't happen" (Dkt. No. 55-1 at 11).  An employment policy regarding internal applicants' eligibility for open positions was then introduced as an exhibit, providing that "[i]f you are on a Performance Improvement Plan (PIP) you may be ineligible for consideration" (Dkt. No. 55-1 at 15).

Plaintiff claims that the second time he spoke with Rader about his health issues, as referenced in Rader's April 19, 2019, email, he provided Rader a note from his doctor, Dr. O'Dulio, stating that he had been in the hospital and needed to be on lighter duties with periodic spells to regroup (Def. SOF ¶¶ 96-97; Pl. Resp. ¶¶ 96-97).  However, Plaintiff has not been able to produce a copy or other indicia of the existence of such a note (Def. ¶ 98; Pl. Resp. ¶ 98). Plaintiff told Rader that he needed to continue to take breaks as needed (Dkt. No. 46-1 at 29). He then went back on the sales floor, and it was never brought up again (Dkt. No. 46-1 at 30). Rader never told Plaintiff that he could not take breaks (Def. SOF ¶ 107; Pl. Resp. ¶ 107). Plaintiff never told Rader that he needed Rader's help making sure he could take the breaks he needed (Def. SOF ¶ 109; Pl. Resp. ¶ 109).  Per Rader's affidavit, he believed that Plaintiff was always able to take breaks during the day where he could sit down and had no concerns with Plaintiff taking breaks to sit down for at least a few minutes a few times a day (Dkt. No. 46-1 at 140).

On April 30, 2019, Plaintiff sent an email to Regional Human Resources Director Paula Rubio ("Rubio") acknowledging that his employment would end with termination in the next 30 days or less (Def. SOF ¶ 49; Pl. Resp. ¶ 49; Dkt. No. 46-1 at 177-179).  According to Plaintiff, during the first PIP meeting on April 1, 2019, Rader discussed the areas in which he was failing, which included some areas that Plaintiff did not realize were his, such as pricing, schedules, and

IRP, and some areas that fall under the Service Manager position (Dkt. No. 46-1 at 177).

Plaintiff further reported that he gave Rader a "game plan" the week after receiving the PIP and

that he "failed" the next week "due to IRP's and not giving him written work lists for my DS's"

(Dkt. No. 46-1 at 177). Plaintiff reported not having a follow-up with Rader the week before but

predicted that when he did "he will fail that period too" (Dkt. No. 46-1 at 178). Plaintiff stated:

> In hindsight I wish I would have spoke up weeks ago regarding
> some health issues I have been having but I decided to wait until
> after Inventory. I have been to the ER 3 times already this year
> with shortness of breath issues. It's brought on by a medicine I
> take for suppressing a consistent cough. It has done some damage
> to my esophagus and caused fatigue due to too much acid in my
> blood. I was going to ask to step down because at nearly 63 I am
> tired and don't really want or need the stress anymore. …. I did
> bring up to Mark that I would like to do this and he said that I
> possibly could if I get through the PIP.

(Dkt. No. 46-1 at 178-179).

On May 2, 2019, Plaintiff's employment was terminated (Def. SOF ¶ 45; Pl. Resp. ¶ 45).

Defendant replaced Plaintiff with two individuals, both in their mid-30s (Pl. SDF ¶ 5). One of

those individuals, Nicholas Porter, started on May 15, 2019, and the other, Stacy Mahaffey,

started on June 15, 2019 (Pl. SDF ¶¶ 5, 30). An email communication dated November 6, 2018,

from the Store Manager of the Lowe's in Manchester, Connecticut, indicated that his

understanding was that Mahaffey, who was an internal transfer from North Carolina, would be in

his store "with intention of in a few months Springfield" (Pl. SDF ¶ 6).

The day after Plaintiff's employment was terminated, Plaintiff sent an email to Regional

Vice President Tim Daley ("Daley") about what he felt was the "unjustified termination" of his

employment (Dkt. 46-1 at 181-184). He noted that, "[t]hough down stocking is a function of the

Service team associates it became the catalyst for my PIP, the emphasis on IRP" (Dkt. No. 46-1

at 181). He further stated that, "on my PIP I was responsible for IRP's, Pricing, review of all

Schedules, and Order Management," but that "[o]n the Operational Roadmap … those 3 areas

fell under the direction of the Service and Sales Manager" (Dkt. No. 46-1 at 182).  Plaintiff

added, "I have had some health issues for the last year or so and they have not been helped by

the extra stress Mark put on me and everybody else to do my own and other peoples work" (Dkt.

No. 46-1 at 182).  According to Plaintiff, he "knew from the beginning of the PIP that it was not

going to work because in that store it was not set up for me to succeed" (Dkt. No. 46-1 at 182).

Shortly after Plaintiff sent his emails to Rubio and Daley, Rubio contacted him and

scheduled a telephone call to discuss his concerns (Def. SOF ¶ 61; Pl. Resp. ¶ 61).  When

Plaintiff and Rubio spoke, the call lasted approximately 45 minutes (Def. SOF ¶ 62; Pl. Resp. ¶

62; Dkt. 56-1 at 68).  According to Plaintiff, Rubio had a number of questions for him and

advised him of a severance package (Def. SOF ¶ 62; Pl. Resp. ¶ 62; Dkt. No. 56-1 at 68-69).

Plaintiff did not tell Rubio that he thought his age or medical condition played a role in the

decision to place him on a PIP or to let him go (Dkt. No. 56-1 at 70).

At his deposition, Plaintiff testified that, in January 2019, he brought to Rader's attention

the fact that Steve Drouin, the night manager, had made a large, discounted purchase of

supposedly damaged drywall (Dkt. No. 46-1 at 41-44).  However, Rader and Drouin were

friends, and Rader immediately got mad about it (Dkt. No. 46-1 at 41, 43-44).  When asked if

Rader was motivated in his treatment of Plaintiff and the ultimate termination of his employment

by the fact that he had brought up this issue about Drouin, Plaintiff replied affirmatively (Dkt.

No. 46-1 at 44).  Plaintiff testified that:

> I really think after that incident in January, I think Mark wanted
> me gone.  I didn't realize how close him and Steve were.  I think I
> walked into something.  I think, you know, I was the older guy.  I
> was having issues.  I think I was targeted with him.

(Dkt. No. 46-1 at 52).

After Plaintiff's employment was terminated, on May 17, 2019, Rader was put on a PIP, for a period until August 2, 2019 (Def. SOF ¶ 67; Pl. Resp. ¶ 67).  On June 20, 2019, Rader's employment was terminated based on the reasons raised in the PIP (Def. SOF ¶ 68; Pl. Resp. ¶ 68).  Subsequently, Becker was also terminated from his employment with Lowe's (Def. SOF ¶ 70; Pl. Resp. ¶ 70).

Lowe's maintains a Workplace Accommodation Policy which provides for reasonable accommodation for employees with disabilities, including workplace modification leave, where appropriate (Def. SOF ¶ 72; Pl. Resp. ¶ 72).  The policy directs employees to Lowe's Workplace Accommodation Request Procedure for details on how to request an accommodation and provides multiple means of contact for employees to address questions about the policy, including an online portal, a telephone number, and the option to contact a Human Resources representative (Def. SOF ¶ 73; Pl. Resp. ¶ 73).  Lowe's maintains a Leave of Absence (LOA) and Workplace Accommodation Frequently Asked Questions (FAQ) document, which provides information to employees regarding the process to request a workplace accommodation, including the following FAQs in different sections:

> **Who should I contact to request a Leave of Absence or a Workplace Accommodation?**
> You should contact the Associate Care Center (ACC) online at www.mylowesbenefits.com > Leaves and Accommodations, call 1-844-HR-LOWES (1-844-475-6937), or see your manager. When possible, inform your manager when you become aware of the need for a leave or accommodation.
>
> **How can I request a workplace accommodation?**
> You should submit a request through www.mylowesbenefits.com > Leaves and Accommodations or call the ACC at 1-844-HR-LOWES (1-844-475-6937).  When possible, inform your manager when you become aware of the need for an accommodation.

16

(Def. SOF ¶ 74; Pl. Resp. ¶ 74).  Lowe's maintains a Workplace Accommodation Procedure, which provides the process for an employee to request an accommodation for a disability:

> To require a workplace accommodation, contact the Associate Care Center (ACC) online at www.mylowesbenefits.com > Leaves and Accommodations or call 1-844-HR-LOWES (1-844-475-6937), or see your manager.

(Def. SOF ¶ 75; Pl. Resp. ¶ 75).  Plaintiff reviewed these documents during his employment and understood that Lowe's had such policies (Def. SOF ¶ 76; Pl. Resp. ¶ 76).  Additionally, Lowe's has a Workplace Accommodation Checklist that states, "[t]his checklist is designed to assist management when an associate requests a workplace accommodation or management becomes aware of an associate's need for a workplace accommodation" (Pl. SDF ¶ 43).  Section 3 of the Checklist states, "[t]here may be instances when the need for an accommodation is obvious and supporting medical documentation may not be necessary.  In these situations, the manager should contact the ACC on behalf of the Associate" (Pl. SDF ¶ 43).

Plaintiff was involved in handling employee requests for accommodations for disabilities in his ASM role (Def. SOF ¶ 78; Pl. Resp. ¶ 78).  If an employee who worked under Plaintiff required an accommodation, he or she would be directed to Lowe's vendor, who would make the decision, and report it back to the manager, and it would be carried out (Def. SOF ¶ 80; Pl. Resp. ¶ 80).  This process did not change during Plaintiff's employment (Def. SOF ¶ 80; Pl. Resp. ¶ 80).  As a manager, Plaintiff experienced multiple occasions when employees requested accommodation and, in those cases, Plaintiff referred employees to the accommodations telephone number (Def. SOF ¶ 81; Pl. Resp. ¶ 81).  Plaintiff did not participate in the decision whether an accommodation was appropriate or not, as that would be handled by Lowe's vendor (Def. SOF ¶ 82; Pl. Resp. ¶ 82).

Plaintiff has been diagnosed with Barrett's Esophagus, a gastrointestinal disorder (Def. SOF ¶ 83; Pl. Resp. ¶ 83).  At no time during the course of his employment did Plaintiff make a request for an accommodation for a disability to the Associate Care Center online or by calling the hotline as set forth in Lowe's policies or by making a request to any Human Resources employee of Lowe's (Def. SOF ¶¶ 84-85; Pl. Resp. ¶¶ 84-85).[4]

C.   Discussion

Plaintiff asserts two causes of action in his complaint: (1) age discrimination in violation Mass. Gen. Laws ch. 151B, § 4, and (2) disability discrimination in violation of Mass. Gen. Laws ch. 151B, § 4(4) (Dkt. No. 1 at 11-12).  Defendant has moved for summary judgment on both counts of Plaintiff's complaint.  The court addresses each count in turn.

*1.   Age Discrimination*

Pursuant to Mass. Gen. Laws ch. 151B, § 4, it is an unlawful employment practice "[f]or an employer in the private sector, by himself or his agent, because of the age of any individual, … to discharge from employment such individual, or to discriminate against such individual in … terms, conditions, or privileges of employment, unless based upon a bona fide occupational qualification."  "In order to prevail at trial, an employee bringing a complaint under G.L. c. 151B, § 4, must demonstrate four things: that he or she is a member of a protected class; that he or she was subject to an adverse employment action; that the employer bore 'discriminatory animus' in taking that action; and that the animus was the reason for the action (causation)." *Bulwer v. Mt. Auburn Hosp.*, 46 N.E.3d 24, 32 (Mass. 2016) (citing *Lipchitz v. Raytheon Co.*, 751 N.E.2d 360, 368 (2001)).  Defendant does not contest Plaintiff's ability to prove the first two elements, and, thus, "[t]he question here is whether … [P]laintiff provided evidence from which

---

[4] Plaintiff purports to dispute these statements of fact but does not cite to any portion of the record controverting them.

a reasonable jury could infer the presence of the latter two elements, i.e., that … [D]efendant[ ]

bore a discriminatory animus and that the animus was the reason … [D]efendant[ ] terminated …

[P]laintiff's employment." *Id.*

An employee asserting a discrimination claim under Mass. Gen. Laws ch. 151B, § 4, may

defeat a motion for summary judgment by providing either direct or indirect evidence of

discriminatory animus and causation.  *Id.*  Direct evidence "consists of statements by a

decisionmaker that directly reflect the alleged animus and bear squarely on the contested

employment decision." *Zampierollo-Rheinfeldt v. Ingersoll-Rand de Puerto Rico, Inc.*, 999 F.3d

37, 51–52 (1st Cir. 2021) (citing *Febres v. Challenger Caribbean Corp.*, 214 F.3d 57, 60 (1st

Cir. 2000)).  While the record contains evidence that Rader made age-related comments, they are

not tied to the termination of Plaintiff's employment.  Thus, they do not qualify as direct

evidence of discrimination, and Plaintiff must rely on indirect evidence to survive Defendant's

motion for summary judgment.  Both Plaintiff and Defendant agree that this is an indirect

evidence case.

In cases involving indirect or circumstantial evidence of discrimination, the court applies

the "familiar three-stage, burden-shifting paradigm first set out in *McDonnell Douglas Corp. v.*

*Green*, 411 U.S. 792, 802-805 (1973) (*McDonnell Douglas*)."  *Bulwer*, 46 N.E.3d at 32.

> "In the first stage [of this paradigm], the plaintiff has the burden to
> show ... a prima facie case of discrimination." *Blare v. Husky*
> *Injection Molding Sys. Boston, Inc.*, 419 Mass. 437, 441, 646
> N.E.2d 111 (1995) (*Blare*).  To do so, a plaintiff must provide
> "evidence that: (1) he [or she] is a member of a class protected by
> G.L. c. 151B; (2) he [or she] performed his [or her] job at an
> acceptable level; [and] (3) he [or she] was terminated." *Id.*  "In the
> second stage, the employer can rebut the presumption created by
> the prima facie case by articulating a legitimate, nondiscriminatory
> reason for its [employment] decision." *Id.*  In the third stage, the
> burden of production shifts back to the plaintiff employee,
> requiring the employee to provide evidence that "the employer's

19

> articulated justification [for the termination] is not true but a
> pretext." *Id.* at 443, 646 N.E.2d 111.

*Id.* at 32–33 (alterations in original) (footnote omitted).

Defendant argues that Plaintiff cannot make out a prima facie case because he cannot establish that he performed his job at an acceptable level where "[h]is employment was in fact terminated for a multitude of well-documented and consistent performance deficiencies …" (Dkt. No. 45 at 5-6).  However, the court "cannot 'consider the employer's alleged nondiscriminatory reason for taking an adverse employment action when analyzing the *prima facie* case." *Meléndez v. Autogermana, Inc.*, 622 F.3d 46, 51 (1st Cir. 2010) (citing *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 574 (6th Cir.2003)).  Doing so "would 'bypass the burden-shifting analysis and deprive the plaintiff of the opportunity to show that the nondiscriminatory reason was in actuality a pretext designed to mask discrimination.'"  *Id.* (citing *Wexler,* 317 F.3d at 574).

To show that he was meeting Lowe's legitimate expectations at the time of his dismissal, Plaintiff relies on his four-and-a-half-year history as an ASM with the company, the lack of any record of discipline before being supervised by Rader, and his history of bonuses and awards before coming to the Springfield store.  The court finds this evidence, as well as Plaintiff's three performance reviews for the first three years of his tenure at Lowe's, which reflect a rating of "Solid Performance," as "minimally sufficient to show that there [i]s a triable issue as to his ability to meet [Lowe's] legitimate expectations."  *Id.* (agreeing with the district court that the plaintiff established the second element of a prima facie case of discrimination based on a ten-year career with the defendant company and a history of rewards for sales performance) (citing *Woodman v. Haemonetics Corp.*, 51 F.3d 1087, 1092 (1st Cir. 1995); *Vélez v. Thermo King de P.R.*, 585 F.3d 441, 4448 (1st Cir. 2009)).

Moving to the second stage of the framework, Defendants assert that Plaintiff's employment was terminated based on Rader's belief that his performance was poor, which was documented in the warning related to Plaintiff's failure to secure cash in the store, Rader's evaluation of Plaintiff in his Fiscal Year 2018 Evaluation Form, the PIP, and email communications from Rader to Whitcomb and Becker.  At this stage, an employer's "burden of production is not onerous," *Blare*, 646 N.E. 2d at 115, and "[t]his evidence satisfies … [D]efendant's obligation to produce both 'lawful … reasons for [its] employment decision' and 'credible evidence to show that the … reasons advanced were the real reasons.'"  *Bulwer*, 46 N.E.3d at 34 (citing *Blare*, 646 N.E.2d at 115).   Indeed, at least for purposes of resisting Defendant's motion for summary judgment, Plaintiff agrees that Defendant has met this nominal burden (Dkt. No. 52 at 2).

Thus, the court turns to the third and final stage of the analysis.  "'Massachusetts is a pretext only jurisdiction,' so … [P]laintiff ... 'need only present evidence from which a reasonable jury could infer that 'the [employer's] facially proper reasons given for its action against him were not the real reasons for that action.'"  *Brader v. Biogen, Inc.*, 983 F.3d 39, 59 (1st Cir. 2020) (quoting *Bulwer*, 46 N.E.3d at 33).  "While … [P]laintiff does bear 'the burden of producing evidence' that the employer's reasons are pretextual, *see Matthews v. Ocean Spray Cranberries, Inc.*, 686 N.E.2d 1303, 1308 (Mass. 1997) (*Matthews*), the burden of persuasion at summary judgment remains with … [D]efendant[ ], who 'as the moving part[y], "ha[s] the burden of affirmatively demonstrating the absence of a genuine issue of material fact on every relevant issue, even if [it] would not have the burden on an issue if the case were to go to trial."'"  *Id*. (quoting *Sullivan v. Liberty Mut. Ins. Co.*, 825 N.E.2d 522, 529 (Mass. 2005)).  The First Circuit has noted that courts should "proceed with caution and restraint when considering

summary judgment motions where, as here, issues of pretext, motive, and intent are in play."

*Taite*, 999 F.3d at 93 (citing *Hodgens v. Gen. Dynamics Corp.*, 144 F.3d 151, 167 (1st Cir.

1998)).  "In cases involving claims of employment discrimination, a defendant employer faces a

heavy burden if it seeks to obtain summary judgment: summary judgment is disfavored

in discrimination cases based on disparate treatment because the question of the employer's state

of mind (discriminatory motive) is 'elusive and rarely is established by other than circumstantial

evidence.'"  *Sullivan*, 825 N.E.2d at 529 (footnote omitted) (quoting *Blare,* 646 N.E.2d at 114).

That said, "[e]ven in cases where elusive concepts such as motive or intent are at issue, summary

judgment may be appropriate if the nonmoving party rests merely upon conclusory allegations,

improbable inferences, and unsupported speculation."  *Brooks v. Peabody & Arnold, LLP*, 878

N.E.2d 572, 579 (Mass. App. Ct. 2008) (citing *Medina–Munoz v. R.J. Reynolds Tobacco Co.*,

896 F.2d 5, 8 (1st Cir.1990)).

   "The most probative means of establishing that the plaintiff's termination was a pretext

for [age] discrimination is to demonstrate that similarly situated [younger] employees were

treated differently."  *Matthews*, 686 N.E.2d at 1309 (citing *Smith College v. Mass. Comm'n*

*Against Discrimination*, 380 N.E.2d 121, 125 (Mass. 1978)).  In addition, "[a] plaintiff can

'establish pretext by showing weaknesses, implausibilities, inconsistencies, incoherencies, or

contradictions in the employer's proffered legitimate reasons such that a factfinder could'

rationally find them unworthy of credence and hence 'infer that the employer did not act for the

asserted [nondiscriminatory reasons]."  *Taite*, 999 F.3d at 93 (alteration in original) (quoting

*Santiago-Ramos v. Centennial P.R. Wireless Corp.*, 217 F.3d 46, 56 (1st Cir. 2000)).  Here, the

record does not contain any comparator evidence, and, thus, to establish that there is a triable

issue as to pretext, Plaintiff must rely on a showing of "weaknesses, implausibilities,

inconsistencies, incoherencies, or contradictions" in relation to Defendant's claim that poor performance was the reason for the termination of his employment.

Plaintiff's theory, as the court understands it, is that Defendant did not terminate Plaintiff's employment because of poor performance, but rather decided by at least November 6, 2018, to replace Plaintiff with Mahaffey, an ASM nearly 30 years his junior.  This, Plaintiff argues, is evidenced by an email communication of that date from the Store Manager of the Lowe's in Manchester, Connecticut, indicating his understanding that Mahaffey would be in his store "with intention of in a few months Springfield."  Coinciding with this decision in early November, Rader asked Plaintiff if he was going to retire soon.  Defendant then attempted to paper over its unlawful termination of Plaintiff's employment in order to replace him with Mahaffey by creating false documentation, including (1) the November 9, 2018, Employee Corrective Action Report, which Plaintiff denies ever having had a conversation with Rader about, ever having seen before the termination of his employment, or ever having refused to sign, and about which Rader lacks recollection, and (2) the Fiscal Year 2018 Evaluation Form in which Rader rated Plaintiff with an Inconsistent Performance but which he has no memory of going over with Plaintiff and which he did not electronically sign until April 15, 2019, a date several months after it should have been signed in the normal course.  The document also shows that Plaintiff signed it on April 15, 2019, but Plaintiff could not have met with Rader to go over and sign the document on that date because he was out sick.  Finally, Plaintiff points out that the comments from Rader relate to subjective rather than objective performance criteria.  Regarding the PIP, Plaintiff contends that he was set up to fail.  The PIP largely revolved around IRP issues, which, Plaintiff notes, were not supposed to be the responsibility of the ASM of Operations. Plaintiff also was terminated only thirty days after being placed on the PIP, and he was replaced

by not one, but two people, which shows that Defendant knew the job could not be performed by one person.  All of this took place against a backdrop that included Rader's numerous age-related comments, which a factfinder could find probative of pretext.

Plaintiff points to several "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions," in Defendant's case, which he maintains support his case.  First, Plaintiff argues that Rader lied during his deposition when he claimed not to have any memory of either of Plaintiff's replacements, when he was included on various email communications both with and about Mahaffey, and where he worked with Porter as a senior ASM, not a low-level employee, for approximately one month.  Similarly, Plaintiff posits that Rader's testimony that he did not recall Plaintiff refusing to sign the November 9, 2018, Employee Corrective Action Report, is not credible because a senior ASM refusing to sign a disciplinary document would be memorable.  Plaintiff also argues that Porter responded to a job posting for a Merchandising ASM but then took the Operations position, supporting an inference that Defendant was engaged in a "deliberate effort … to 'hide its tracks' in that it … advertis[ed] for one position, but hire[d] for a different position (Dkt. No. 52 at 7).  Plaintiff finds implausible Defendant's lack of documentation regarding the creation, funding, or approval of a second ASM of Operations position in the Springfield store.  Finally, Plaintiff notes that the Springfield store was regarded as one of the most difficult in Defendant's 1,700 store chain and that "Lowe's claim that [Plaintiff] could not perform the job and was let go due to 'performance' issues is contradicted by the facts that the Springfield store is one of its most challenging stores, and the recognition that due to issues in that store it takes <u>at least</u> two people to perform the job duties that they assigned to [Plaintiff]" (Dkt. No. 52 at 9).

The primary problem with Plaintiff's theory is that it rests on the foundational inference that, by early November 2018, Lowe's intended to replace Plaintiff with Mahaffey, but this inference is not borne out by the record. The notion is premised on nothing more than a single sentence email from Defendant's Store Manager in Manchester, Connecticut, to Becker stating, "[s]o my understanding is she will be here with intention of in a few months Springfield?" (Dkt. No. 56-1 at 136). Not only is there nothing in the record establishing that this "understanding," which the Store Manager phrased as a question, was correct, but also, even if it was correct at the time, it does not establish that Mahaffey was intended to replace anyone, as opposed to simply increasing the number of ASMs in Springfield, or that, if she was intended as a replacement, that it was Plaintiff she was to replace, as opposed to any of the other three ASMs in Springfield. Moreover, there is a subsequent email exchange in the record between the same Store Manager and Rader dated January 19, 2019, in which Rader asks when Mahaffey will be coming to him, and the response is, "Not anymore. She now [sic] my permanent ASM. From the new roll out" (Dkt. No. 56-1 at 156). This is corroborated by an affidavit from Whitcomb, in which she avers that on December 1, 2018, Mahaffey transferred from a Lowe's in North Carolina to the Manchester, Connecticut, store and served as its ASM of Support, and then on January 26, 2019, she was assigned as ASM of Operations for the Manchester, Connecticut, store (Dkt. No. 55-1 at 3). Therefore, the record as a whole, even viewed in the light most favorable to Plaintiff as it must be, does not reasonably support an inference that Defendant intended to replace Plaintiff with Mahaffey as early as November 6, 2018.

Another problem with Plaintiff's theory relates to the issue of the Employee Corrective Action Report. Plaintiff does not dispute that the event that precipitated the warning – the leaving out of a cash bag overnight – happened or that he was ultimately responsible. While he

does dispute the validity of the document itself, the record contains contemporaneous email communications between Rader and Whitcomb establishing both that the decision to discipline Plaintiff was made and that the document was drawn up around the time of the incident (Dkt. No. 46-1 at 145-147, 149-151).  Thus, again, the record does not reasonably support the inference that Plaintiff urges that the document was "falsified … to support [Defendant's] efforts to oust [Plaintiff] for alleged poor performance" (Dkt. No. 52 at 6).

Additionally, a number of Plaintiff's identified "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions," lead nowhere.  Even if Rader was lying during his deposition about his inability to recall Mahaffey or Porter – a conclusion which is by no means inevitable considering how little Rader overlapped with Mahaffey or Porter before his own employment was terminated and the length of time that elapsed until he was deposed – it does not support an inference that his claims regarding Plaintiff's poor performance were pretextual.  The same is true with respect to Rader's alleged dishonesty about his recollection of presenting Plaintiff with the Employee Corrective Action Report.  Finally, neither Plaintiff's disbelief that Defendant has no documentation regarding the creation, funding, or approval of a second ASM of Operations position in the Springfield store, nor his vague suspicions around Porter responding to a job posting for a Merchandising ASM but then taking a position as Operations ASM, are probative of pretext.

These deficiencies in Plaintiff's theory, however, do not dictate that judgment enter for Defendant if the record nevertheless presents a material question of fact as to whether Defendant's facially proper reason given for terminating Plaintiff's employment, i.e., his poor performance, was not the real reason for that action.  On the record before it, the court finds that Plaintiff clears this hurdle, even if just barely.  A jury could infer that the statements allegedly

made by Rader, including calling Plaintiff "old man," "jumpy old man," "grumpy old man," and "grandpa," calling another older employee "old guy," and telling another older employee he was "getting too old for this;" stating that Plaintiff was "probably there when Jesus was born;" stating that Plaintiff "should have to work during the day because [he doesn't] have headlights on [his] car because [he's] not allowed to drive at night;" telling Plaintiff he needed a position that allowed him to sit because he needed "young blood on the [sales] floor;" and asking Plaintiff if he was going to retire soon, together indicate age-based animus. *See Kelley v. Airborne Freight Corp.*, 140 F.3d 335, 347 (1st Cir. 1998) (citing *Mulero–Rodríguez v. Ponte, Inc.*, 98 F.3d 670, 676 (1st Cir.1996) ("It is settled that statements made by decisionmakers can evidence age discrimination."); *McMillan v. Mass. Soc. for the Prevention of Cruelty to Animals*, 140 F.3d 288, 301 (1st Cir. 1998) (quoting *O'Connor v. DePaul Univ.*, 123 F.3d 665, 671-72 (7th Cir. 1997) ("'[S]tray remarks – made by the decisionmaker but not related to the disputed employment action – may be relevant to the question of pretext ….").

Defendant argues that Plaintiff's deposition testimony that Rader made age-related comments is not credible because Plaintiff did not allege that Rader made age-related comments in his complaint before the Massachusetts Commission Against Discrimination or in his complaint in this case. Additionally, in his answers to interrogatories, Plaintiff did not state that Rader made any age-related comments but rather claimed that Rader was present when others made age-related comments and either did not respond or laughed and never told any of the staff that the age-related comments were inappropriate. While a factfinder may be influenced by these inconsistencies, credibility it not an issue to be resolved at summary judgment. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ("Credibility determinations … are jury functions, not those of a judge … ruling on a motion for summary judgment.").

Defendant further argues that "[i]solated or ambiguous remarks, tending to suggest animus based on age, are insufficient, standing alone, to prove an employer's discriminatory intent." *Blare*, 646 N.E.2d at 118 n.9 (quoting *Fontaine v. Ebtec Corp.*, 613 N.E.2d 881, 885 n.7 (Mass. 1993)).  However, "such remarks carry more weight when made by the decisionmaker," *Furlonge v. Boston Med. Ctr.*, Civil No. 14-10389-FDS, 2016 WL 70450, at *9 (D. Mass. Jan. 6, 2016) (citing *McMillan*, 140 F.3d at 301; *Dávila v. Corporación De Puerto Rico Para La Difusión Pública*, 498 F.3d 9, 16 (1st Cir. 2007)).  Moreover, Rader's alleged comments are neither isolated nor ambiguous, and "[t]he remarks … do not stand alone." *Id*.  There is additional evidence from which a jury might infer pretext and, hence, discrimination.  Before Rader became Plaintiff's manager, Plaintiff was consistently rated as displaying a "Solid Performance," including in the Fiscal Year 2017 Evaluation Form, which was after Plaintiff took on the new role of ASM of Operations in the Springfield store (Dkt. No. 56-1 at 174).  Then Rader arrived and, within a short time, he rated Plaintiff as displaying an "Inconsistent Performance."  As noted by Plaintiff, the commentary Rader provided to justify this rating was largely subjective.  "While the use of subjective employment criteria does not in itself indicate discriminatory animus, *Hicks v. Johnson*, 755 F.3d 738, 746 (1st Cir. 2014), subjective evaluations may be susceptible to manipulation and can mask discrimination." *Greene v. Walgreen E. Co.*, No. 16-2487, 2018 WL 8263947, at *5 (1st Cir. Nov. 15, 2018).  Finally, Plaintiff offers more than conjecture to support his theory that he was set up to fail the PIP.  In particular, Plaintiff was assigned responsibility for IRP in the PIP, when there is evidence in the record that inventory was the responsibility of the Specialty ASM, not the ASM of Operations (Dkt. No. 46-1 at 81).  A reasonable jury could conclude that holding Plaintiff responsible for

IRP made it impossible for one person to satisfactorily handle all aspects of the job, as further evidenced by the fact that Defendant replaced Plaintiff with two ASMs of Operations.

Moreover, "there must come a point … when there are enough remarks, all along the same lines, that they can no longer be considered 'stray' and analyzed in isolation, when they plainly offer a window into the way the decisionmaker … think[s]." *Diaz v. Jiten Hotel Mgmt., Inc.*, 762 F. Supp. 2d 319, 336–37 (D. Mass. 2011) (concluding that a reasonable jury could find that the plaintiff was denied raises on account of her age where the employer gave a false reason for denying a pay raise, fabricated reports about the plaintiff and her direct manager called her an "old shoe," "old hankie," and "old pumpkin," told her that she was turning the place into a "nursing home" when she hired a 52-year-old, and repeatedly told her that she was getting old and asked when she was going to retire, and where another manager told her that "old people must remain home."). In this case, viewing the record in the light most favorable to Plaintiff, Rader made many age-related remarks over the relatively short time – 9 months – that he supervised Plaintiff. Plaintiff is entitled to have a jury decide whether Rader made these remarks, whether they indicated a discriminatory intent, and how much weight they should be given. *Fontaine v. Ebtec Corp.*, 613 N.E.2d 881, 885 n.7 (Mass. 1993) (citing *Bechold v. IGW Sys., Inc.*, 817 F.2d 1282, 1286 (7th Cir. 1987)).

In summary, the court concludes that, viewed in the light most favorable to Plaintiff, the record sets forth a genuine issue of material fact as to whether the reason given for the termination of his employment was pretextual. "[I]n cases of circumstantial evidence (like this one), where the evidence may be viewed as supporting a conclusion that the defendant's proffered reason is false, the case must go to the jury." *Younker v. Dep't of Transitional Assistance*, 11 N.E.3d 132, 135 (Mass. App. Ct. 2014) (citing *Lipchitz*, 751 N.E.2d at 368).

Therefore, Defendant is not entitled to summary judgment on Plaintiff's age discrimination claim. This is not to say that the plaintiff has shown pretext. The court holds only that there is sufficient evidence to send the issue to a jury.

### 2. Handicap Discrimination

Pursuant to Mass. Gen. Laws ch. 151B, § 4 (16), it is an unlawful employment practice "[f]or any employer, personally or through an agent, … to dismiss from employment … or otherwise discriminate against, because of his handicap, any person alleging to be a qualified handicapped person, capable of performing the essential functions of the position involved with reasonable accommodation, unless the employer can demonstrate that the accommodation required to be made to the physical or mental limitations of the person would impose an undue hardship to the employer's business." Plaintiff's claim of handicap discrimination in violation of Mass. Gen. Laws ch. 151B is based on his contention that Defendant did not make reasonable accommodation for his disability.[5] "To prove h[is] case, … [P]laintiff must show that [he] was a 'qualified handicapped person' capable of performing the essential functions of his job with reasonable accommodation; [he] requested such accommodation, and [Defendant] refused to provide it; and, as a result of this refusal, he suffered some harm." *Alba v. Raytheon Co.*, 809 N.E.2d 516, 522 n.9 (Mass. 2004) (citing *Cox v. New England Tel. & Tel. Co.*, 607 N.E.2d 1035, 1039 (Mass. 1993)). "A 'qualified handicapped person' is entitled to a 'reasonable accommodation' that will enable him to perform the essential functions of his job, so long as the accommodation does not place an undue burden or hardship on the employer." *Godfrey v. Globe*

---

[5] In its motion papers, Defendant states that Plaintiff claims that he was denied a reasonable accommodation and that he was terminated from employment because of his disability. The complaint only states a failure to accommodate claim (Dkt. No. 1 at 11-12), and Plaintiff does not argue in his responsive motion papers that his employment was terminated because of a disability. Therefore, the court limits its discussion to Lowe's asserted failure to provide a reasonable accommodation.

*Newspaper Co., Inc.*, 928 N.E.2d 327, 333 (Mass. 2010) (citing Mass. Gen. Laws ch. 151B, §

4(16); *Cox*, 607 N.E.2d at 1041 n.3).  "[I]t is the employee's initial request for an accommodation

which triggers the employer's obligation to participate in the interactive process of determining

one." *Ocean Spray Cranberries, Inc. v. Massachusetts Comm'n Against Discrimination*, 808

N.E.2d 257, 267 (Mass. 2004) (quoting *Russell v. Cooley Dickinson Hosp., Inc.*, 772 N.E.2d

1054, 1065 (Mass. 2002)).  "The refusal of the employer to participate in that process once

initiated, or to make a reasonable accommodation once it has been identified, is a violation of

[Massachusetts] discrimination laws." *Id*.

Defendant argues that it is entitled to summary judgment because Plaintiff cannot show

that it denied him a reasonable accommodation for a disability.  The crux of Defendant's

argument is that Plaintiff was permitted the only accommodation he alleges that he requested,

namely the ability to take two-to-three-minute breaks two-to-three times per day.  While Plaintiff

testified that Rader did not respond affirmatively or negatively on either of the two occasions

that he raised the issue of needing to take these limited breaks, he concedes that Rader never told

him that he could not take them.  Further, on one occasion following Plaintiff's first request for

the accommodation, Rader invited Plaintiff to sit down and take a break if needed.  Plaintiff

testified that sometimes he was able to take the needed breaks, while at other times, he was not.

However, Plaintiff acknowledges that he never told Rader that he needed his help to make sure

he could take the breaks.  Nor did Plaintiff ever contact the web address or phone number

Lowe's designated for employees who had a need for an accommodation.  On these facts,

viewed in the light most favorable to Plaintiff, he cannot prevail on the theory that Defendant

denied him a reasonable accommodation.[6]

To the extent Plaintiff now argues that Defendant's refusal to allow him a demotion was a failure to make reasonable accommodation, a claim that he did not make in his complaint, Plaintiff fares no better.  "The decisional law … settles firmly … that a reasonable accommodation does not extend to transfer of the employee to an alternate position or to a vacant position…."  *Nicholls v. Bos. Transp. Dep't*, No. 13-P-293, 2014 WL 738202, at *2 (Mass. App. Ct. 2014) (citing *Russell*, 772 N.E.2d at 1063; *Tompson v. Dep't of Mental Health*, 924 N.E.2d 747, 755 (Mass. App. Ct. 2010); *Scott v. Encore Images, Inc.*, 955 N.E.2d 319, 325 (Mass. App. Ct. 2011)).  Plaintiff does not dispute that Defendant was not required to demote or transfer him to a different position as a matter of law.  Instead, Plaintiff argues that Defendant's refusal to act in the face of his request amounts to failure to engage in the interactive dialogue required.  However, the only accommodation Plaintiff has identified, aside from the occasional two-to-three-minute breaks that Defendant did not deny him, is a demotion to a lower position.  "An interactive process claim cannot succeed unless the interaction could have led to the discovery of a reasonable accommodation that would have enabled the plaintiff to perform the essential functions of h[is] position."  *Richardson v. Friendly Ice Cream Corp.*, 594 F.3d 69, 82 (1st Cir. 2010) (citing *Kvorjak v. Maine*, 259 F.3d 48, 53 (1st Cir. 2001); *Soto–Ocasio v. Fed. Express Corp.,* 150 F.3d 14, 19 (1st Cir.1998)).  Plaintiff has not identified such an accommodation that Defendant was legally required to provide, and, therefore, his claim fails.

---

[6] Plaintiff faults Rader, Becker, and Whitcomb for not initiating a reasonable accommodation review pursuant to Lowe's Workplace Accommodation Checklist.  However, Plaintiff does not identify any accommodation he needed that would have come out of such a review other than the two-to-three-minute breaks he was allowed.  Moreover, Plaintiff has not shown that it should have been so obvious to his managers that he required an accommodation that they should have initiated the reasonable accommodation request or dialogue.

Thus, this court concludes that Defendant is entitled to summary judgment on Plaintiff's claim of handicap discrimination.

### D. CONCLUSION

For the above-stated reasons, Plaintiff's motion to strike certain material from the summary judgment record (Dkt. No. 50) is DENIED and Defendant's motion for summary judgment (Dkt. No. 45) is DENIED as to Plaintiff's claim of age discrimination but GRANTED as to Plaintiff's claim of disability discrimination.  The Clerk's Office is directed to schedule a status conference in this case on a date in the near future that is convenient to the court and the parties.

It is so ordered.

Dated:  August 3, 2022                                        /s/ Katherine A. Robertson
                                                                     KATHERINE A. ROBERTSON
                                                                     United States Magistrate Judge

!